# SUPREME COURT OF THE UNITED STATES

———————

No. 25A169

———————

## KRISTI NOEM, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* PEDRO VASQUEZ PERDOMO, ET AL.

ON APPLICATION FOR STAY

[September 8, 2025]

The application for stay presented to JUSTICE KAGAN and by her referred to the Court is granted. The July 11, 2025 order entered by the United States District Court for the Central District of California, case No. 2:25–cv–5605, is stayed pending the disposition of the appeal in the United States Court of Appeals for the Ninth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE KAVANAUGH, concurring in the grant of the application for stay.

I vote to grant the Government's application for an interim stay pending appeal of the District Court's injunction.

The Immigration and Nationality Act authorizes immigration officers to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 66 Stat. 233, 8 U. S. C. §1357(a)(1). Immigration officers "may briefly detain" an individual "for questioning" if they have "a reasonable suspicion, based on specific articulable facts, that the person being questioned . . . is an alien illegally in the United States." 8 CFR

§287.8(b)(2) (2025); see *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 884 (1975); *United States* v. *Arvizu*, 534 U. S. 266, 273 (2002). The reasonable suspicion inquiry turns on the "totality of the particular circumstances." *Brignoni-Ponce*, 422 U. S., at 885, n. 10; *Arvizu*, 534 U. S., at 273.

The Government estimates that at least 15 million people are in the United States illegally. Many millions illegally entered (or illegally overstayed) just in the last few years.

Illegal immigration is especially pronounced in the Los Angeles area, among other locales in the United States. About 10 percent of the people in the Los Angeles region are illegally in the United States—meaning about 2 million illegal immigrants out of a total population of 20 million.

Not surprisingly given those extraordinary numbers, U. S. immigration officers have prioritized immigration enforcement in the Los Angeles area. The Government sometimes makes brief investigative stops to check the immigration status of those who gather in locations where people are hired for day jobs; who work or appear to work in jobs such as construction, landscaping, agriculture, or car washes that often do not require paperwork and are therefore attractive to illegal immigrants; and who do not speak much if any English. If the officers learn that the individual they stopped is a U. S. citizen or otherwise lawfully in the United States, they promptly let the individual go. If the individual is illegally in the United States, the officers may arrest the individual and initiate the process for removal.

Immigration stops based on reasonable suspicion of illegal presence have been an important component of U. S. immigration enforcement for decades, across several presidential administrations. In this case, however, the District Court enjoined U. S. immigration officers from making investigative stops in the Los Angeles area when the stops are based on the following factors or combination of factors: (i) presence at particular locations such as bus

stops, car washes, day laborer pickup sites, agricultural sites, and the like; (ii) the type of work one does; (iii) speaking Spanish or speaking English with an accent; and (iv) apparent race or ethnicity.[1]

The Government contends that the injunction will substantially hamper its efforts to enforce the immigration laws in the Los Angeles area. The Government has therefore asked this Court to stay the District Court's injunction.

To obtain a stay from this Court, the moving party must demonstrate a fair prospect that, if the District Court's decision were affirmed on appeal, this Court would grant certiorari and reverse. The moving party also must show a likelihood that it would suffer irreparable harm if a stay were not granted. Those two factors are the "most critical." *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). Particularly in "close cases," the Court also considers the balance of harms and equities to the parties, including the public interest. *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); see *Nken*, 556 U. S., at 435.

In my view, the Government has made a sufficient showing to obtain a stay pending appeal.

To begin with, given the significance of the issue to the Government's immigration enforcement efforts, this Court would likely grant certiorari if the Court of Appeals affirmed the District Court's injunction. See, e.g., *United States* v. *Texas*, 599 U. S. 670 (2023); *Biden* v. *Texas*, 597 U. S. 785 (2022).

In addition, on two alternative grounds, the Government has demonstrated a fair prospect of reversal of the District Court's injunction.

––––––––––

[1] The Los Angeles area at issue here is the Central District of California, which includes the counties of Los Angeles, Ventura, Santa Barbara, San Luis Obispo, Orange, Riverside, and San Bernardino.

First, under this Court's decision in *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983), plaintiffs likely lack Article III standing to seek a broad injunction restricting immigration officers from making these investigative stops. In *Lyons*, the Court held that standing to obtain future injunctive relief does not exist merely because plaintiffs experienced past harm and fear its recurrence. What matters is the "*reality* of the threat of repeated injury," not "subjective apprehensions." *Id.*, at 107, n. 8. So too here.

Plaintiffs' standing theory largely tracks the theory rejected in *Lyons*. Like in *Lyons*, plaintiffs here allege that they were the subjects of unlawful law enforcement actions in the past—namely, being stopped for immigration questioning allegedly without reasonable suspicion of unlawful presence. And like in *Lyons*, plaintiffs seek a forward-looking injunction to enjoin law enforcement from stopping them without reasonable suspicion in the future. But like in *Lyons*, plaintiffs have no good basis to believe that law enforcement will unlawfully stop *them* in the future based on the prohibited factors—and certainly no good basis for believing that any stop of the plaintiffs is imminent. Therefore, they lack Article III standing: "Absent a sufficient likelihood" that the plaintiffs "will again be wronged in a similar way," they are "no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U. S., at 111; see *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398 (2013); Application 16–22; Reply 4–9.[2]

Plaintiffs' standing theory is especially deficient in this case because immigration officers also use their experience

—————

[2] To be clear, the plaintiffs have Article III standing to seek damages for any unlawful action taken against them. For standing purposes, *Lyons* distinguished between claims for damages and claims for broad forward-looking injunctive relief.

to stop suspected illegal immigrants based on a variety of factors. So even if the Government had a policy of making stops based on the factors prohibited by the District Court, immigration officers might not rely *only* on those factors if and when they stop plaintiffs in the future.

Second, even if plaintiffs had standing, the Government has a fair prospect of succeeding on the Fourth Amendment issue. See *Brignoni-Ponce*, 422 U. S. 873; *Arvizu*, 534 U. S. 266; Application 22–30; Reply 9–14.

To stop an individual for brief questioning about immigration status, the Government must have reasonable suspicion that the individual is illegally present in the United States. See *Brignoni-Ponce*, 422 U. S., at 880–882; *Arvizu*, 534 U. S., at 273; *United States* v. *Sokolow*, 490 U. S. 1, 7 (1989). Reasonable suspicion is a lesser requirement than probable cause and "considerably short" of the preponderance of the evidence standard. *Arvizu*, 534 U. S., at 274. Whether an officer has reasonable suspicion depends on the totality of the circumstances. *Brignoni-Ponce*, 422 U. S., at 885, n. 10; *Arvizu*, 534 U. S., at 273. Here, those circumstances include: that there is an extremely high number and percentage of illegal immigrants in the Los Angeles area; that those individuals tend to gather in certain locations to seek daily work; that those individuals often work in certain kinds of jobs, such as day labor, landscaping, agriculture, and construction, that do not require paperwork and are therefore especially attractive to illegal immigrants; and that many of those illegally in the Los Angeles area come from Mexico or Central America and do not speak much English. Cf. *Brignoni-Ponce*, 422 U. S., at 884–885 (listing "[a]ny number of factors" that contribute to reasonable suspicion of illegal presence). To be clear, apparent ethnicity alone cannot furnish reasonable suspicion; under this Court's case law regarding immigration stops, however, it can be a

"relevant factor" when considered along with other salient factors. *Id.*, at 887.

Under this Court's precedents, not to mention common sense, those circumstances taken together can constitute at least reasonable suspicion of illegal presence in the United States. Importantly, reasonable suspicion means only that immigration officers may briefly stop the individual and inquire about immigration status. If the person is a U. S. citizen or otherwise lawfully in the United States, that individual will be free to go after the brief encounter. Only if the person is illegally in the United States may the stop lead to further immigration proceedings.

In short, given this Court's precedents, the Government has demonstrated a fair prospect of success both on standing and Fourth Amendment grounds. To conclude otherwise, this Court would likely have to overrule or significantly narrow two separate lines of precedents: the *Lyons* line of cases with respect to standing and the *Brignoni-Ponce* line of cases with respect to immigration stops based on reasonable suspicion. In this interim posture, plaintiffs have not made a persuasive argument for this Court to overrule or narrow either line of precedent, much less both of them.

The Government has also demonstrated that it would likely suffer irreparable harm if the District Court's injunction is not stayed. As the Court has indicated, """[a]ny time""" that the Government is """"enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.""" *Trump* v. *CASA, Inc.*, 606 U. S. ___, ___ (2025) (slip op., at 25) (quoting *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers)).

So it is in this case, particularly given the millions of individuals illegally in the United States, the myriad "significant economic and social problems" caused by illegal immigration, *Brignoni-Ponce*, 422 U. S., at 878, and the

Government's efforts to prioritize stricter enforcement of the immigration laws enacted by Congress. Notably, moreover, the District Court's injunction threatens contempt sanctions against immigration officers who make brief investigative stops later found by the court to violate the injunction. The prospect of such after-the-fact judicial second-guessing and contempt proceedings will inevitably chill lawful immigration enforcement efforts.

On the two most critical factors, therefore, the Government has demonstrated that a stay is warranted.

Turning then to the balance of harms and equities: As with many other applications for interim relief to this Court, the harms and equities may appear weighty on both sides. In those circumstances, to borrow Justice Scalia's apt words from a different context, trying to determine whether one party's harms or equities outweigh another party's can be akin to "judging whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 897 (1988) (Scalia, J., concurring in judgment). Moreover, in a case like this involving government action, balancing the harms and equities can become especially difficult and policy-laden. That is because a court must balance the harms to the regulated and negatively affected parties not only against the harms to the Government as an institution, but also against the harms to the third parties who otherwise would *benefit* from the challenged government action. Cf. *Nken*, 556 U. S., at 436.[3]

_____

[3] There can be situations where, based on the record before this Court, it appears that a temporary injunction or stay would not impose much if any harm on the non-prevailing party in the interim period before a final judgment. See, *e.g., NetChoice, LLC* v. *Fitch*, 606 U. S. \_\_\_, \_\_\_ (2025) (KAVANAUGH, J., concurring in denial of application to vacate stay) (slip op., at 2); Response in Opposition in *NetChoice, LLC* v. *Fitch*, No. 25A97, pp. 38–39. But especially in cases involving a significant new law or government action, the interim harms and equities are typically weighty on both sides. In those situations, as I have explained before, resolving

In any event, the balance of harms and equities in this case tips in favor of the Government. The interests of individuals who are illegally in the country in avoiding being stopped by law enforcement for questioning is ultimately an interest in evading the law. That is not an especially weighty legal interest.

To be sure, I recognize and fully appreciate that many (not all, but many) illegal immigrants come to the United States to escape poverty and the lack of freedom and opportunities in their home countries, and to make better lives for themselves and their families. And I understand that they may feel somewhat misled by the varying U. S. approaches to immigration enforcement over the last few decades. But the fact remains that, under the laws passed by Congress and the President, they are acting illegally by remaining in the United States—at least unless Congress and the President choose some other legislative approach to legalize some or all of those individuals now illegally present in the country. And by illegally immigrating into and remaining in the country, they are not only violating the immigration laws, but also jumping in front of those noncitizens who follow the rules and wait in line to immigrate into the United States through the legal immigration process. For those reasons, the interests of

―――――――――

the application therefore often will depend on this Court's assessment of likelihood of success on the merits. See *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 3–4) (when applicant has demonstrated irreparable harm and when the harms and equities are weighty on both sides, "this Court has little choice but to decide the emergency application by assessing likelihood of success on the merits"); *Trump* v. *CASA, Inc.*, 606 U. S. ___, ___ (2025) (KAVANAUGH, J., concurring) (slip op., at 10) ("[I]n deciding applications for interim relief involving major new statutes or executive actions, we often have no choice but to make a preliminary assessment of likelihood of success on the merits; after all, in cases of that sort, the other relevant factors (irreparable harm and the equities) are often very weighty on both sides").

illegal immigrants in evading questioning (and thus evading detection of their illegal presence) are not particularly substantial as a legal matter.

Moreover, as for stops of those individuals who are legally in the country, the questioning in those circumstances is typically brief, and those individuals may promptly go free after making clear to the immigration officers that they are U. S. citizens or otherwise legally in the United States.

Finally, although the dissent emphasizes the force allegedly used by immigration officers, that is not the issue in this case. The District Court enjoined the Government from stopping individuals for questioning based on several enumerated factors. The injunction is silent as to the use of force. And it is not necessary for the injunction to address that use-of-force question because the Fourth Amendment's reasonableness standard continues to govern the officers' use of force and to prohibit excessive force.

To the extent that excessive force has been used, the Fourth Amendment prohibits such action, and remedies should be available in federal court. I agree with the dissent on that point. But to reiterate, this injunction against brief stops for questioning does not address the use-of-force issue.

In short, the balance of harms and equities favors the Government here.

Especially in an immigration case like this one, it is also important to stress the proper role of the Judiciary. The Judiciary does not set immigration policy or decide enforcement priorities. It should come as no surprise that some Administrations may be more laissez-faire in enforcing immigration law, and other Administrations more strict. Article III judges may have views on which policy approach is better or fairer. But judges are not appointed to make those policy calls. We merely ensure, in justiciable cases, that the Executive Branch acts within the confines of the Constitution and federal statutes. Just as

this Court a few years ago declined to step outside our constitutionally assigned role to improperly *compel* greater Executive Branch enforcement of the immigration laws, see *United States* v. *Texas*, 599 U. S. 670; *Biden* v. *Texas*, 597 U. S. 785, we now likewise must decline to step outside our constitutionally assigned role to improperly *restrict* reasonable Executive Branch enforcement of the immigration laws. Consistency and neutrality are hallmarks of good judging, and in my view, we abide by those enduring judicial values in this case by granting the stay.

In sum, the Government has demonstrated a fair prospect of success on the merits and has met the other factors for an interim stay pending appeal of the District Court's injunction. I therefore vote to grant the Government's application.

# SUPREME COURT OF THE UNITED STATES

—————

No. 25A169

—————

## KRISTI NOEM, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* PEDRO VASQUEZ PERDOMO, ET AL.

ON APPLICATION FOR STAY

[September 8, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

In early June, the Government launched immigration enforcement raids across Los Angeles and its surrounding counties. During the raids, teams of armed and masked agents pulled up to car washes, tow yards, farms, and parks and began seizing individuals on sight, often before asking a single question.

A Federal District Court found that these raids were part of a pattern of conduct by the Government that likely violated the Fourth Amendment. Based on the evidence before it, the court held that the Government was stopping individuals based solely on four factors: (1) their apparent race or ethnicity; (2) whether they spoke Spanish or English with an accent; (3) the type of location at which they were found (such as a car wash or bus stop); and (4) the type of job they appeared to work. Concluding that stops based on these four factors alone, even when taken together, could not satisfy the Fourth Amendment's requirement of reasonable suspicion, the District Court temporarily enjoined the Government from continuing its pattern of unlawful mass arrests while it considered whether longer-term relief was appropriate.

Instead of allowing the District Court to consider these troubling allegations in the normal course, a majority of

this Court decides to take the once-extraordinary step of staying the District Court's order. That decision is yet another grave misuse of our emergency docket. We should not have to live in a country where the Government can seize anyone who looks Latino, speaks Spanish, and appears to work a low wage job. Rather than stand idly by while our constitutional freedoms are lost, I dissent.

## I

### A

In early June, the Government launched "Operation At Large" in Los Angeles, deploying roving patrols of armed and masked immigration agents to local car washes, Home Depots, tow yards, bus stops, farms, recycling centers, churches, and parks. Over the course of the next month, the Government made nearly 2,800 immigration-related arrests and detained many more.

For instance, on June 9, immigration agents arrived at a tow yard in Montebello "carrying handguns" and "military-style rifle[s]." ECF Doc. 45–9, p. 6.[1] Jason Gavidia, a Latino U. S. citizen, was working on his car in the tow yard that day. A masked agent ordered Gavidia to "'[s]top right there'" and began asking him questions. *Ibid.* Agents then asked Gavidia whether he is "American at least three times"; three times, Gavidia affirmed that he is. *Ibid.* Unsatisfied, the agents asked Gavidia for the name of the hospital in which he was born, and when Gavidia could not immediately recall, the agents racked a rifle, took Gavidia's phone, "pushed [him] up against the metal gated fence, put [his] hands behind [his] back, and twisted [his] arm." *Id.,* at 6–7. Agents released Gavidia only after he offered up his REAL ID. That ID was never returned to him.

Less than 10 miles away in Whittier, immigration agents raided a car wash managed by U. S. citizen Jorge

––––––––––
[1] All ECF citations are to No. 25–cv–5605 (CD Cal., July 2, 3, 14, 17, 28, 2025 and Aug. 7, 2025) unless otherwise specified.

Viramontes. In the nine days between June 9 and 19, agents returned four times, each instance in the middle of the workday. On one occasion, an agent questioned Viramontes, asking if he is a citizen and requesting that he show his ID. Viramontes replied that he is a dual U. S. and Mexican citizen and supplied his California driver's license. The agent said the ID was insufficient, "grabbed [his] arm," escorted him to a vehicle, and drove him to a "warehouse area" for further questioning. ECF Doc. 45–4, p. 6. Agents detained Viramontes for 20 minutes while they made calls to verify his U. S. citizenship and examined his Mexican ID before eventually driving him back to work.

Other Operation At Large encounters have included even more force and even fewer questions. For example, agents pulled up in four unmarked cars to a bus stop in Pasadena; "the doors opened and men in masks with guns started running at" three Latino men who were having their morning coffee, waiting to be picked up for work. ECF Doc. 45–1, p. 5. In Glendale, nearly a dozen masked agents with guns "jumped out of . . . cars" at a Home Depot, and began "chasing" and "tackl[ing]" Latino day laborers without "identify[ing] themselves as ICE or police, ask[ing] questions, or say[ing] anything else." ECF Doc. 45–6, pp. 5–6. In downtown Los Angeles, agents "jumped out of a van, rushed up to [a tamale vendor], surrounded him, and handled him violently," all "[w]ithout asking . . . any questions." ECF Doc. 38–9, p. 7; see also, *e.g.*, ECF Doc. 45–14, p. 5 (masked agents with guns "ran out of the vehicles and rushed towards the workers" at a car wash); ECF Doc. 45–11, pp. 5–6 (three masked agents wearing bullet-proof vests got out of a car with "rifles" at a Home Depot and tear-gassed the crowd).

The operation has sparked "panic and fear" across Los Angeles and its surrounding areas. ECF Doc. 45–8, p. 10. Some have likened the detentions to "kidnapping[s]." ECF Doc. 45–2, p. 5; ECF Doc. 45–3, p. 5; ECF Doc. 45–7, p. 7.

One Latino U. S. citizen "feel[s] like [he] need[s] to carry [his] passport for protection, in case federal agents stop [him] again." ECF Doc. 45–21, p. 5. Another Latino U. S. citizen similarly "worries that as a visibly Latino man, he could be detained" if he does not carry his passport, but "decided against [doing so] because he believes that as an American, he should not have to live like that in his own country." ECF Doc. 38–9, at 6. Many are "struggl[ing] to make ends meet" because they are "afraid to go to work." ECF Doc. 45–8, at 15; see ECF Doc. 45–13, p. 8. Others are "reluctant to attend school meetings" and "pick their children up from school" for fear of being detained. ECF Doc. 45–8, at 12.

## B

### 1

Gavidia, Viramontes, three other individuals stopped during Operation At Large, and four associations filed this putative class action against Secretary of Homeland Security Kristi Noem and other senior federal immigration enforcement officials. As relevant, the plaintiffs allege that the Government has violated the Fourth Amendment by adopting a policy, pattern, or practice of stopping individuals without reasonable suspicion "based on nothing but broad profiles," including "apparent race and ethnicity." ECF Doc. 16, p. 13.[2] The plaintiffs then moved for a temporary restraining order (TRO) to prevent the Government from conducting further stops based solely on four factors: apparent race or ethnicity, speaking Spanish or speaking English with an accent, presence in a particular location

––––––––––––

[2] The five individual plaintiffs and three of the four associations (Los Angeles Worker Center Network, United Farm Workers of America, and the Coalition for Humane Immigrant Rights) brought the Fourth Amendment claim. The fourth organization, the Immigrant Defenders Law Center, brought claims concerning detainees' access to counsel and their conditions of confinement. Those claims are not before the Court.

(*e.g.*, bus stop, car wash, etc.), and the type of work one does. They argued that these four factors, even when taken together, cannot support reasonable suspicion of unlawful activity absent more specific information about the person being stopped or the location being searched.

The plaintiffs submitted 21 declarations describing dozens of seizures that occurred throughout the Central District in June and early July. The plaintiffs also submitted statements by federal officials regarding the Government's immigration enforcement efforts. For instance, in late May, White House Deputy Chief of Staff Stephen Miller reportedly told officers to "'just go out there and arrest illegal aliens,'" and directed them to target "Home Depot" and "7-Eleven" stores.[3] Senior immigration officials also told agents to "'turn the creativity knob up to 11,'" to "'push the envelope,'" and that "'[i]f it involves handcuffs on wrists, it's probably worth pursuing.'"[4]

In opposition to the motion for a TRO, the Government submitted two declarations generally describing its operations. One stated that the Government's officers are "trained to consider the totality of the circumstances when determining whether reasonable suspicion exists" and that "[c]ertain types of businesses, including car washes, have been selected for encounters because past experiences have demonstrated that illegal aliens utilize and seek work at these locations." ECF Doc. 71–2, pp. 2–3.

---

[3] E. Findell, R. Simon, M. Hackman, & T. Parti, The White House Marching Orders That Sparked the L. A. Migrant Crackdown, The Wall Street Journal, June 9, 2025, https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[4] J. Olivares, US Immigration Officers Ordered to Arrest More People Even Without Warrants, The Guardian, June 4, 2025, https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

2

The District Court granted the TRO on July 11. The court found that there was "ample evidence that seizures occurred based solely upon the four enumerated factors[,] either alone or in combination." App. to Application for Stay of TRO 100a (App.). Indeed, the Government submitted no evidence suggesting that its seizures to date were based on anything other than those four factors. The court further found that a "plethora of statements suggest[ed] approval or authorization" of the Government's pattern of relying solely on the four factors and that "there is a real and immediate threat that the conduct complained of will continue." *Id.*, at 96a. Thus, the court held that the plaintiffs had standing given the "high likelihood of recurrent injury." *Ibid.* The court then held that the seizures based solely on the four factors likely violated the Fourth Amendment because "'officer[s] cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population.'" *Id.*, at 99a–100a (quoting *United States* v. *Manzo-Jurado*, 457 F. 3d 928, 935 (CA9 2006)). The court finally concluded that a districtwide injunction was necessary to provide the parties complete relief because "given how th[e] enforcement actions appear to have been conducted, it would be a fantasy to expect that law enforcement could and would inquire whether a given individual was among the named . . . [p]laintiffs or the (putative) class before proceeding with a seizure." App. 97a.

Accordingly, the court entered a TRO providing in relevant part:

"a. As required by the Fourth Amendment of the United States Constitution, Defendants shall be enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U. S. immigration law.

"b. In connection with paragraph [a], Defendants may not rely solely on the factors below, alone or in combination, to form reasonable suspicion for a detentive stop, except as permitted by law: i. Apparent race or ethnicity; ii. Speaking Spanish or speaking English with an accent; iii. Presence at a particular location (e.g., bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or iv. The type of work one does." *Id.*, at 111a (paragraph breaks omitted).

The Government appealed to the Ninth Circuit and moved for a stay pending appeal. In doing so, it submitted an additional declaration reiterating that officers are "trained that, under the Fourth Amendment . . . brief detention for questioning requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is" undocumented. ECF Doc. 94–1, pp. 3–4. Nevertheless, the Ninth Circuit noted, the Government chose "not [to] dispute that these detentive stops have been based solely on the four enumerated factors" and "did not challenge the district court's findings that those stops are part of a pattern of conduct that has apparent official approval." App. 21a. Instead, the Government argued that the plaintiffs lacked Article III standing, that the TRO was inconsistent with the Fourth Amendment, and that the injunction exceeded what was necessary to provide the plaintiffs complete relief. The court rejected those arguments and, in large part, denied the Government's request to stay the District Court's TRO pending appeal.[5]

The parties then began briefing the appeal and the Government's opening brief was submitted on August 11. In the District Court, the plaintiffs filed motions for a

---

[5] The Ninth Circuit granted a stay only as to the phrase, "except as permitted by law," which it found to be impermissibly vague. App. 37a–38a, 61a.

preliminary injunction and class certification, which are set to be heard on September 24. In the meantime, the Government sought a stay in this Court pending further proceedings.

## II

"A stay is an 'intrusion into the ordinary processes of administration and judicial review.'" *Nken* v. *Holder*, 556 U. S. 418, 427 (2009) (quoting *Virginia Petroleum Jobbers Assn.* v. *FPC*, 259 F. 2d 921, 925 (CADC 1958) (*per curiam*)). This Court will not grant one absent "extraordinary circumstances." *Ruckelshaus* v. *Monsanto Co.*, 463 U. S. 1315, 1316 (1983) (Blackmun, J., in chambers). The applicant bears "an especially heavy burden" where, as here, the matter remains pending before the Court of Appeals, and two lower courts have already denied such relief. *Packwood* v. *Senate Select Comm. on Ethics*, 510 U. S. 1319, 1320 (1994) (Rehnquist, C. J., in chambers). Ordinarily, the Court considers the applicant's likelihood of success on the merits, the likelihood of irreparable harm absent emergency intervention, and the balance of the equities. See *Nken*, 556 U. S., at 434; see also *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).

## A

The Government, and now the concurrence, has all but declared that all Latinos, U. S. citizens or not, who work low wage jobs are fair game to be seized at any time, taken away from work, and held until they provide proof of their legal status to the agents' satisfaction. As the District Court found, and the Government does not meaningfully contest, the present evidence reveals that the Operation At Large "seizures occurred based solely upon the four enumerated factors, either alone or in combination." App. 100a. The Government now asks this Court to bless that conduct, at least temporarily, by issuing a stay. The

Government, however, has not demonstrated the necessary likelihood of success on the merits to warrant this Court's extraordinary intervention.

1

The Fourth Amendment "imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 554 (1976). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person, and the Fourth Amendment requires that seizure be reasonable." *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975) (internal quotation marks and citation omitted). As relevant here, officers may stop an individual "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the individual "may be illegally in the country." *Id.*, at 884. This requires "more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Illinois* v. *Wardlow*, 528 U. S. 119, 123–124 (2000) (quoting *Terry* v. *Ohio*, 392 U. S. 1, 27 (1968)).

Critically, a set of facts cannot constitute reasonable suspicion if it "describe[s] a very large category of presumably innocent" people. *Reid* v. *Georgia*, 448 U. S. 438, 441 (1980) (*per curiam*). In *Brignoni-Ponce*, for example, the Court held that "Mexican ancestry" alone did not constitute reasonable suspicion to support stops by Border Patrol agents, even near the border, because "[l]arge numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry." 422 U. S., at 886–887. So too in *Brown* v. *Texas*, 443 U. S. 47, 51–52 (1979), the Court held that standing in an alley in a "neighborhood frequented by drug users" did not rise to reasonable suspicion because that activity was "no different from the

activity of other pedestrians in that neighborhood." See also *Kansas* v. *Glover*, 589 U. S. 376, 385, n. 1 (2020) (reiterating the need for "an individualized suspicion that a particular citizen was engaged in a particular crime" beyond just a "demographic profile" (internal quotation marks omitted)).

The Fourth Amendment thus prohibits exactly what the Government is attempting to do here: seize individuals based solely on a set of facts that "describe[s] a very large category of presumably innocent" people. *Reid*, 448 U. S., at 441. As the District Court correctly held, the four factors—apparent race or ethnicity, speaking Spanish or English with an accent, location, and type of work—are "no more indicative of illegal presence in the country than of legal presence." App. 105a. The factors also in no way reflect the kind of individualized inquiry the Fourth Amendment demands. See, *e.g.*, *Terry*, 392 U. S., at 21, n. 18 ("This demand for specificity . . . is the central teaching of this Court's Fourth Amendment jurisprudence"); *United States* v. *Arvizu*, 534 U. S. 266, 277 (2002) (relying on particularized facts about the vehicle and its passengers to justify stop based on reasonable suspicion). Allowing the seizure of any Latino speaking Spanish at a car wash in Los Angeles tramples the constitutional requirement that officers "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States* v. *Cortez*, 449 U. S. 411, 417–418 (1981).

The Government, joined by the concurrence, brushes aside this Court's precedent with an appeal to probability, arguing that the "high prevalence" of undocumented immigrants in the Central District "*should* enable agents to stop a relatively broad range of individuals." Application to Stay TRO 28. Without even a citation, the Government asserts that "10 percent of the population in the Central District" is unlawfully present, so it is "inevitable and unremarkable" that immigration officers would target any Latino

person, or any person speaking accented English, or any person standing in a particular type of location, or any person working a low wage job in the greater Los Angeles area. *Ibid.* Never mind that nearly 47 percent of the Central District's population identifies as Hispanic or Latino. App. 45a; ECF Doc. 45–19, pp. 6–7. Never mind that over 37 percent of the population of Los Angeles County speaks Spanish at home, and over 55 percent speak a language other than English. App. 46a. "Of course, aggregate statistics . . . cannot substitute for the individualized suspicion that the Fourth Amendment requires." *Glover*, 589 U. S., at 390, n. (KAGAN, J., concurring).[6]

In fact, the Court rejected a similar argument levied by the Government in *Brignoni-Ponce.* There, the Government asserted that it could stop drivers of apparent Mexican ancestry in border areas because most undocumented immigrants in those areas are Mexican and most "leave the border area in private vehicles." 422 U. S., at 879. Unlike today, the Court there rightly rejected the Government's rationales because they would cover "a large volume of legitimate traffic as well." *Id.*, at 882. "[W]ithout any suspicion that a *particular* vehicle is carrying [undocumented] immigrants," the Government's broad, statistical approach to reasonable suspicion "would subject the residents of these

_____

[6]The concurrence acknowledges that the Government cannot stop someone based solely on apparent ethnicity, but seems to suggest that combining an individual's ethnicity with any one of the other factors could add up to reasonable suspicion. See *ante,* at 5 (opinion of KAVANAUGH, J.). That ignores the obvious reality that ethnicity and language are often intertwined, so relying on only those two factors is no different than relying on ethnicity alone. (Even the Government does not go so far as to argue that relying solely on ethnicity and language would constitute reasonable suspicion.) From here, adding on the fact that someone appears to work a low paying job does little to move the needle either; the concurrence fails to explain how that fact helps an agent differentiate between someone who has legal status and someone who does not considering both kinds of individuals may work those jobs.

and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers." *Ibid.* (emphasis added). Rather, the Court found that reasonable suspicion required additional factors, particularly ones specific to a given vehicle or individual, such as "[t]he driver's behavior," whether the vehicle is "heavily loaded" or has "an extraordinary number of passengers," or whether the officer "observe[s] persons trying to hide." *Id.*, at 885. The holding and reasoning in *Brignoni-Ponce* clearly supports, rather than undermines, the District Court's injunction here. Contra, *ante,* at 6 (KAVANAUGH, J., concurring in grant of application for stay).

Next, the Government moves beyond background demographics and argues that the four factors limited by the TRO could, in some hypothetical scenarios, give rise to reasonable suspicion. For example, the Government posits that if agents had intelligence that a workplace was "known to have hired 100" undocumented individuals "the prior week," immigration enforcement officials might well have reasonable suspicion to stop a person at that site. Application to Stay TRO 25. This argument fares no better than the first. As an initial matter, that proffered scenario falls outside the scope of the TRO. A seizure on those hypothetical facts would not rest solely on the four factors but would instead incorporate an additional probative fact: the intelligence about a particular employer's recent hiring decisions. App. 107a. Nothing in the TRO prevents the Government from conducting such a seizure.

In any event, Operation At Large bears little resemblance to the Government's hypothetical. The Government has provided no evidence showing that its seizures were based on credible intelligence about a *particular* employer at a *particular* location. Indeed, the Government submitted no evidence about what facts its agents relied upon to conduct most of the seizures documented in the record. Rather, its

declarations suggest that the Government generally targeted locations based on the "*types* of businesses" that, in the agents' generalized experiences, undocumented immigrants supposedly frequent. ECF Doc. 71–2, at 2 (emphasis added). That is plainly insufficient to give rise to a "particularized and objective basis for suspecting [a] particular person" under the Fourth Amendment. *Cortez*, 449 U. S., at 417–418.[7]

2

The Government and the concurrence also attack the named plaintiffs' standing to seek injunctive relief, relying heavily on the Court's decision in *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983). *Lyons* does not bear the weight the Government and the concurrence place on it and provides no valid basis to justify the majority's intervention.

Our standing requirement ensures that each plaintiff has a "'personal stake in the outcome.'" *Id.*, at 101 (quoting *Baker* v. *Carr*, 369 U. S. 186, 204 (1962)). In *Lyons*, the plaintiff had sought an injunction against the city of Los Angeles after a police officer applied a chokehold to him during a traffic stop, in violation of the department's policy and allegedly the Fourth Amendment. 461 U. S., at 97–98, 106, and n. 7, 110. The plaintiff lacked standing, the Court said, because he failed to establish a likelihood of recurrent injury. The Court cited a lack of evidence, for instance, that

---

[7] The concurrence gestures at the "proper role of the Judiciary" in immigration cases and cites the Immigration and Nationality Act and federal regulations which authorize immigration officers to question immigrants about their status. *Ante*, at 9 (opinion of KAVANAUGH, J.). Neither that statute nor its implementing regulations authorize stops based solely on the four factors the Government relies upon. Of course, even if a theoretical statute did so, "'no Act of Congress can authorize a violation of the Constitution'" and it remains the Judiciary's role to "decide whether the Fourth Amendment allows" the seizures at issue. *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 877–878 (1975) (quoting *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 272 (1973)).

the "City ordered or authorized police officers to act in such [a] manner," *id.*, at 106, and emphasized that the District Court did not otherwise make a "finding that Lyons faced a real and imminent threat of again being illegally choked," *id.*, at 110; see also *id.*, at 106, n. 7.

The Government and the concurrence contend this is *Lyons* 2.0. In their view, the plaintiffs lack standing to seek prospective injunctive relief because they have similarly failed to establish a "'real and immediate threat of repeated injury.'" 461 U. S., at 102 (quoting *O'Shea* v. *Littleton*, 414 U. S. 488, 496 (1974)). The Government and concurrence, however, ignore the record evidence and the District Court's factual findings that set this case far apart from *Lyons*.

To start, the record reflects the Government's systematic operation to target broad segments of the population based on race and ethnicity, language, location, and occupation. See App. 100a. Each individual plaintiff fits that profile and has already been seized based upon it. The plaintiffs are also almost certain to return to the location in which they were seized because they were seized while either at work or on their way to work. The record, including the Government's own declarations, further makes clear that a given location is likely to be targeted again and again. See ECF Doc. 45–5, p. 5 (one car wash visited four times in nine days); ECF Doc. 71–2, at 2; App. 96a, n. 26 (CBP Chief Patrol Agent Bovino stating his division "'may well go back to MacArthur Park or other places in and around Los Angeles'"). In addition, the District Court found there to be a "plethora of statements suggesting approval or authorization" of those practices. *Id.*, at 96a. On this record, it is no surprise that the District Court made an "affirmativ[e] find[ing] that there is a real and immediate threat that the conduct complained of will continue." *Ibid.* The Government nowhere argues (and the concurrence does not even suggest) that any of the District Court's findings on this point are clearly erroneous.

These findings show that the plaintiffs, by doing nothing more than going to work every day, are likely to be seized by agents who are targeting their specific workplaces in accordance with the Government's practice. That reality stands in sharp contrast to the situation in *Lyons*, where the Court found it unlikely that Lyons would not only be pulled over by police again but that an officer would then violate department policy to apply a chokehold absent provocation. 461 U. S., at 105–108.

The concurrence instead contends that agents also "use their experience to stop suspected [undocumented] immigrants based on other permissible factors," so even if the plaintiffs were stopped again, it could be based on factors other than the four listed in the TRO. *Ante*, at 4 (opinion of KAVANAUGH, J.). Hypothetically, they could. The evidence in this case, however, reveals that the Government is likely to continue relying solely on those four factors because that is what agents are currently authorized and instructed to do. See App. 100a–102a. At no point during this litigation has the Government suggested that it plans to change its operations. See *infra*, at 18–19 (describing the Government's intentions to continue its operations in light of the TRO). In fact, the Government filed this stay application so that it could continue relying solely on these four factors.

On this preliminary record, the individual plaintiffs have demonstrated that they face a "realisti[c] threa[t]" of being stopped again. *Lyons*, 461 U. S., at 106; see, *e.g.*, *303 Creative LLC* v. *Elenis*, 600 U. S. 570, 583 (2023) (plaintiff established a "credible threat" of future enforcement based on State's "'history of past enforcement against nearly identical conduct'"); *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" (quoting *Steffel* v. *Thompson*, 415 U. S. 452, 459 (1974))).

3

Finally, the Government challenges the scope of the or-
dered relief, arguing that the districtwide injunction vio-
lates this Court's recent holding in *Trump* v. *CASA, Inc.*,
606 U. S. \_\_\_, \_\_\_ (2025). But that is not a sufficient basis
for the Court's intervention at this stage. The District
Court found that a districtwide injunction was necessary to
afford the named plaintiffs "'complete relief,'" App. 97a, as
*CASA* requires, 606 U. S., at \_\_\_ (slip op., at 16). That relief
was necessary, the District Court reasoned, because the
very essence of the Government's pattern of conduct is to
seize first and ask questions later. See, *e.g.*, ECF Doc. 45–
6, at 5 (agents "jumped out of the cars" and "tackle[d]" peo-
ple before asking questions); ECF Doc. 45–10, p. 5 (agents
pulled up in a "fast and intimidating" way and masked
agent "grabbed [a worker's] arm" before asking a question);
ECF Doc. 45–14, at 5 (agents with guns "ran out of the ve-
hicles and rushed towards the workers"). Given that pat-
tern, which is amply supported by the record, the District
Court found that "it would be a fantasy to expect that law
enforcement could and would inquire whether a given indi-
vidual was among the named . . . [p]laintiffs or the (puta-
tive) class before proceeding with a seizure." App. 97a. The
Government, which must show that the District Court
abused its discretion, did not provide a meaningful expla-
nation about how it would change its conduct to identify the
plaintiffs before effectuating a seizure. See *Ashcroft* v.
*American Civil Liberties Union*, 542 U. S. 656, 664 (2004).
In any event, and important to any proper consideration of
the equities, see *infra*, at 17–20, the District Court will soon
consider the plaintiffs' class-certification motion. See ECF
Doc. 108, p. 10; ECF Doc. 140, p. 1 (hearing set for Sept. 24).
That forthcoming decision is likely to affect the justification
for and scope of any injunction, thereby obviating the reme-
dial issue presented here. See *CASA*, 606 U. S., at \_\_\_
(KAVANAUGH, J., concurring) (slip op., at 2) (explaining that

courts may "award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide").

## B

An applicant must not only show a likelihood of success on the merits, but must also demonstrate that "the implementation of the judgment pending appeal will lead to irreparable harm." *Graves* v. *Barnes*, 405 U. S. 1201, 1203 (1972) (Powell, J., in chambers). In deciding whether to grant a stay, this Court, moreover, must "balance the equities" and "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes* v. *E-Systems, Inc. Group Hospital Medical & Surgical Ins. Plan*, 501 U. S. 1301, 1305 (1991) (Scalia, J., in chambers, denying application for stay) (internal quotation marks omitted).[8]

In this case, the Court yet again grants emergency relief to the Government when irreparable harm is sorely lacking. The Government's sole argument on this score is that the TRO "chills [its] enforcement efforts" and "deters officers from stopping suspects even when they have reasonable

––––––––

[8] The concurrence quotes Justice Scalia's separate opinion in *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 897 (1988) (opinion concurring in judgment), to support the notion that balancing the equities in cases involving government action is "especially difficult." *Ante,* at 7 (opinion of KAVANAUGH, J.). Justice Scalia's opinion there critiqued the Court's use of a balancing test in the entirely separate Dormant Commerce Clause context. *Bendix Autolite Corp.*, 486 U. S., at 897. It went on to observe that the Court "sometimes make[s] similar balancing judgments in determining how far the needs of the State can intrude upon the liberties of [an] individual." *Ibid.* (internal quotation marks omitted). That type of balancing, Justice Scalia explained, is "of the essence of the courts' function as the nonpolitical branch," and much unlike the Court's weighing of "the governmental interests of a State against the needs of interstate commerce" in the Dormant Commerce Clause context, which is a "task squarely within the responsibility of Congress." *Ibid.*

suspicion on other grounds." Application to Stay TRO 36. That misconstrues both the TRO and our standard for assessing irreparable harm. The TRO does not preclude the Government from enforcing its immigration laws, so long as in doing so it stops individuals based on additional facts on top of the four factors listed. In any event, the Government has only "offer[ed] a series of hypothetical" enforcement actions that, "it thinks, *might* be chilled"; it has not "provid[ed] concrete proof that 'harm is imminent.'" *Murthy* v. *Missouri*, 601 U. S. ___, ___ (2023) (ALITO, J., joined by THOMAS, J., and GORSUCH, J., dissenting from grant of application for stay) (slip op., at 3) (quoting *White* v. *Florida*, 458 U. S. 1301, 1302 (1982) (Powell, J., in chambers)). Of course, "such speculation does not establish irreparable harm." *Murthy*, 601 U. S., at ___ (opinion of ALITO, J.) (slip op., at 4).

Moreover, the on-the-ground reality contradicts the Government's and the concurrence's claim of a chilling effect. Since the issuance of the TRO, Secretary of Homeland Security Kristi Noem has called the District Judge an "'idiot'" and vowed that "'none of [the Government's] operations are going to change.'"[9] The CBP Chief Patrol Agent in the Central District has stated that his division will "turn and burn" and "go even harder  now,"[10] and has posted videos on social media touting his agents' continued efforts "[c]hasing, cuffing, [and] deporting" people at car washes.[11] See also ECF Doc. 128–6, pp. 5–6 (declaration describing July 21 incident in which two masked agents walked into a

————————

[9] NBC News, DHS Secretary Kristi Noem Calls California Judge an "Idiot" Over Immigration Detention Ruling, July 12, 2025, https://www.youtube.com/shorts/8iuX7h.

[10] NewsNation, Border Patrol Chief on California Raids: 'I'm Going to Go Harder': Exclusive, at 22:30–23:10, July 17, 2025, https://www.youtube.com/watch?v=Ne_Tmg2uaak.

[11] Commander Op At Large CA Gregory K. Bovino, X, Aug. 29, 2025, https://x.com/cmdropatlargeca/status/196147602326704463?s=46.

donut shop, grabbed two Latino men, and threw them to the ground or against a wall, all without asking any questions). Accordingly, there is no reason to credit the Government's assertion that it will suffer irreparable harm.[12]

Instead, it is the people of Los Angeles and the Central District who will suffer from this Court's grant of relief to the Government. Immigration agents are not conducting "brief stops for questioning," as the concurrence would like to believe. *Ante,* at 9 (opinion of KAVANAUGH, J.). They are seizing people using firearms, physical violence, and warehouse detentions. Nor are undocumented immigrants the only ones harmed by the Government's conduct. United States citizens are also being seized, taken from their jobs, and prevented from working to support themselves and their families.

The concurrence relegates the interests of U. S. citizens and individuals with legal status to a single sentence, positing that the Government will free these individuals as soon as they show they are legally in the United States. *Ante,* at 8 (opinion of KAVANAUGH, J.). That blinks reality. Two plaintiffs in this very case tried to explain that they are U. S. citizens; one was then pushed against a fence with his arms twisted behind his back, and the other was taken

_____

[12] The concurrence contends that "'any time' that the Government is 'enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Ante,* at 6 (opinion of KAVANAUGH, J.) (quoting *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers)). At the outset, this TRO plainly does not enjoin the Government from effectuating any statute. No statute authorizes the Government to stop individuals based on these four factors alone. The concurrence instead appears to affirm the idea that "although *other* stay applicants must point to more than the annoyance of compliance with lower court orders they don't like, the Government can approach the courtroom bar with nothing more than that and obtain relief from this Court nevertheless." *SSA* v. *AFSCME*, 605 U. S. \_\_\_, \_\_\_ (2025) (JACKSON, J., dissenting from grant of application for stay) (slip op., at 9).

away from his job to a warehouse for further questioning. More fundamentally, it is the Government's burden to prove that it has reasonable suspicion to stop someone. The concurrence improperly shifts the burden onto an entire class of citizens to carry enough documentation to prove that they deserve to walk freely. The Constitution does not permit the creation of such a second-class citizenship status.

The equities therefore lie with the plaintiffs. Countless people in the Los Angeles area have been grabbed, thrown to the ground, and handcuffed simply because of their looks, their accents, and the fact they make a living by doing manual labor. Today, the Court needlessly subjects countless more to these exact same indignities.

## III

The Court's order is troubling for another reason: It is entirely unexplained. In the last eight months, this Court's appetite to circumvent the ordinary appellate process and weigh in on important issues has grown exponentially. See, *e.g.*, *Trump* v. *J. G. G.*, 604 U. S. ___ (2025) (*per curiam*); *Trump* v. *Wilcox*, 605 U. S. ___ (2025); *Noem* v. *Doe*, 605 U. S. ___ (2025); *United States* v. *Shilling*, 605 U. S. ___ (2025). Its interest in explaining itself, unfortunately, has not. See *Trump* v. *Boyle*, 606 U. S. ___, ___–___ (2025) (KAGAN, J., dissenting from grant of application for stay) (slip op., at 2–3).

There may be good justification for issuing an unreasoned order in some circumstances. See *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (KAVANAUGH, J., concurring in grant of application for stay) (slip op., at 11–12) (explaining how opinions on emergency applications "can sometimes come at a cost"). Yet, some situations simply cry out for an explanation, such as when the Government's conduct flagrantly violates the law, or when lower courts and litigants need guidance about the issues on which they should focus.

Here, for instance, the District Court will soon convene a hearing on plaintiffs' motions for a preliminary injunction and class certification with the benefit of a more fulsome record on which to evaluate plaintiffs' claims. When it does so, it will have only a concurrence and a dissent from which to reason. Neither the District Court nor the parties will know whether the majority believed the key issue was standing, the merits, or the scope of relief, any one of which could have been the basis for the majority's order. See, *e.g.*, *McMahon* v. *New York*, 606 U. S ___ (2025) (similarly failing to state whether the basis of the Court's order was standing, merits, or scope of the remedy). For each of those complex issues, it will be anyone's guess whether the majority thought there were evidentiary deficiencies, legal errors, or a combination of both. This situation demands more.

\*　　\*　　\*

The Fourth Amendment protects every individual's constitutional right to be "free from arbitrary interference by law officers." *Brignoni-Ponce*, 422 U. S., at 878. After today, that may no longer be true for those who happen to look a certain way, speak a certain way, and appear to work a certain type of legitimate job that pays very little. Because this is unconscionably irreconcilable with our Nation's constitutional guarantees, I dissent.